## GLOVER v. SAVANNAH, FLORIDA AND WESTERN RAILWAY COMPANY, and vice versa.

1. The amendments to the petition did not set up a new and distinct cause of action, and the petition as amended set forth a cause of action against the defendant.

2. An action brought by a widow to recover for the homicide of her husband under section 3828 of the Civil Code is not barred if the same is filed within two years from the death of her husband, notwithstanding it appears on the face of the petition that it was filed more than two years from the date of the injury from which death resulted.

3. A plaintiff who submits to a ruling that his petition is defective without amendment, and amends to meet the objection which would otherwise result in dismissing his case, will not be thereafter heard to say that the amendment was not necessary.

4. The evidence on the questions of negligence involved was of such a character that the case should have been submitted to a jury. It was therefore error to grant a nonsuit. '

Argued February 8, — Decided March 17, 1899.

Action for damages. Before Judge Norwood. City court of Savannah. July term, 1898.

The action was for the homicide of the plaintiff's husband, James Glover. The original petition, after alleging that at the time of the injuries that caused his death he was an employee of the defendant railway company, working in its yard as a lead switchman, and that it was his duty to change switches, drill cars and couple and uncouple cars, alleged further: (Paragraph 4) That about seven o'clock on the night of April 2, 1895, in the said yard of said company, your petitioner's husband, in the discharge of his usual and customary duties, was engaged in drilling and making up freight-trains; that while engaged in said work about seven freight-cars, all coupled together, were standing on the main line, and that bearing down upon the said seven cars was a switch-engine, pushing in its front about five freight-cars, all coupled together; and that said switch-engine and cars were waved down by your petitioner's husband, and that in obedience to said signals from him the engineer then and there in charge of said engine brought the said engine and cars to a full stop a short distance before reaching the said seven cars. (Paragraph 5) That after

said engine and cars had come to a full stop, your petitioner's husband started to make the coupling between the cars that had just stopped and the said seven cars; that it was necessary, owing to the fact that one of the coupling-pins for said coupling was on the ground beneath one of the cars, for your petitioner's husband to be on the track and stooping down under the end of one of the said cars. (Paragraph 6) That the yard foreman of said yard, he being the officer or agent of said railway company in charge of the switching and making up of said trains, uncoupled the cars two or three car-lengths from your petitioner's husband, and between him and the said engine; that after the said yard foreman had uncoupled the cars as aforesaid, well knowing, but unmindful of the fact that your petitioner's husband had not yet come out from between the cars where he entered to make said coupling, waved the switch-engine ahead briskly, intending that all the cars below the point where he, the said foreman, had uncoupled, should be kicked beyond a near-by switch; that the engineer then and there in charge of said switch-engine and running the same as an employee of said defendant railway company, in obedience to the signal given by the said yard foreman in charge of said switching and making up of trains, and without any notice or warning having been given to your petitioner's husband, moved the engine and cars ahead briskly, striking your petitioner's husband and mashing, fastening, crushing and cutting him with the brake-beams, trucks and wheels of said cars. The petition then alleged, that by reason of the crushing of petitioner's husband by the cars, his left arm was broken, his left foot mangled, and he was injured internally about the abdomen and hips, and that as a direct consequence of these injuries he died November 16, 1895; that he had been receiving remunerative wages for his work; that she and her two children were entirely dependent upon his labor for their support; that his death was the result of gross negligence on the part of the defendant, and that she was thereby damaged in the sum of $10,000. The petition was filed October 11, 1897.

The defendant demurred on the grounds, that the petition failed to set forth a cause of action, and that it was barred by

the statute of limitations. The demurrer was overruled. Plaintiff subsequently, over the objection of defendant that the amendment set forth a new and distinct cause of action and changed substantially the complaint set forth in the original petition, was allowed by the court to amend the petition by setting forth the age of the deceased and the amount of his monthly earnings, and by changing the allegations in paragraphs 4, 5 and 6 as to the position of the cars, the number of cars, and the position of plaintiff at the time of the injury, so that these paragraphs should read as follows: (Paragraph 4) That about seven o'clock on the night of April 2, 1895, in the said yard of said company, your petitioner's husband, in the discharge of his usual and customary duties, was engaged in drilling and making up freight-trains; that while engaged in said work, about twelve freight-cars, seven of them being all coupled together, were left standing on the side-track, and that bearing down upon the said twelve cars was a switch-engine, pushing in its front about five freight-cars, all coupled together; that said switch-engine and cars were waved down by your petitioner's husband, and that in obedience to said signals from him the engineer then and there in charge of said engine brought the said engine and cars to a full stop a short distance before reaching the said twelve cars. (Paragraph 5) That after said engine and cars had come to a full stop, your petitioner's husband started to make the coupling between the fifth and sixth cars of the twelve cars first mentioned; that it was necessary, owing to the fact that one of the coupling-pins for said coupling was on the ground beneath one of the cars, for your petitioner's husband to be on the said track and stooping down under the end of one of the said cars. (Paragraph 6) That the yard foreman of said yard, he being the officer or agent of said railway company in charge of the switching and making up of said trains, uncoupled the cars attached to said engine, two or three car-lengths from said engine, said yard foreman being between your petitioner's husband and the said engine; that after the said yard foreman had uncoupled the cars as aforesaid, well knowing, but unmindful of the fact that your petitioner's husband had not yet come out from between

the cars where he entered to make said coupling, waved the switch-engine ahead briskly; that the engineer then and there in charge of said switch-engine and running the same as an employee of said defendant railway company, in obedience to the signal given by the said yard foreman in charge of said switching and making up of trains, and without any notice or warning having been given to your petitioner's husband, moved the engine and cars ahead briskly, striking your petitioner's husband and mashing, fastening, crushing and cutting him with the brakebeams, trucks and wheels of said cars.

The defendant subsequently moved to dismiss the petition as amended, for want of an allegation that the plaintiff's husband was free from fault. The court sustained the motion, but before the judgment was entered the plaintiff offered an amendment alleging that, in discharging his duties as alleged, her husband was free from fault. This amendment was allowed over the objection of the defendant, that there was nothing in the petition that would support the amendment, and that it would make a new cause of action. At the trial the defendant moved for a nonsuit on the ground that the scienter alleged in paragraph 6, to wit, that "said yard foreman . . well knowing, but unmindful of the fact that your petitioner's husband had not yet come out from between the cars . . waved the switch-engine ahead briskly," had not been proved. The motion was sustained, but before the judgment was entered the court, over the objection of the defendant that the amendment would make a new and distinct cause of action, allowed the plaintiff to amend the petition by striking the words "well knowing, but unmindful of the fact," from that portion of paragraph 6 last quoted, and by substituting the words, "without using due care and caution to ascertain the whereabouts of your petitioner's husband, and without ascertaining." The defendant then renewed its motion for a nonsuit, on the grounds that the evidence failed to make out a case and failed to sustain the allegations of negligence on the part of defendant, or to show that the plaintiff's husband was free from fault. The court sustained the motion, and the plaintiff excepted, alleging that the court erred in requiring her to amend the petition and al-

lege that her husband was free from fault, in holding that the scienter had not been proved, and in granting the nonsuit. The defendant, by cross-bill of exceptions, assigned error on the overruling of its demurrer, and on the allowance of the several amendments to the petition.

The material evidence was the following testimony of William Robinson: On April 2, 1895, I was working for the Savannah, Florida and Western Railway Company, switching. James Glover was employed there switching also. We were working together. I was present when he was hurt that evening, about 6.15 o'clock. Twelve cars had been pulled in on the side-track; first seven cars and then five. The coupling had not been made between the seven cars and five cars. When the engine came into the track for the third time it had five cars attached to it, and I waved the engineer down for Glover to make the coupling to the seven cars. The engineer obeyed the signal and stopped. After the engine with the cars attached to it had stopped, Glover went between the cars on the side-track. He had given us the signal to stop before going in between the cars. I received no signal from Glover to come ahead. I saw his light, and then, after he waved us down, I did not see his light any more. That is how I know he went in between the cars. Mr. Knight, yard foreman, had his train-list in his hand and began to check off his cars. Then he asked me if I saw Glover, and I said no; then he asked me again, "Do you see him now?" I said no, and he said, "I wonder what he is doing." I said, "I don't know." He went on a little longer checking off his cars, and said, "Do you see him now?" I said, "No, sir;" and he said, "I see him. Come ahead." I said, "I don't see him yet," and he said, "Come ahead. What are you waiting on?" He said, "I see him;" and I said, "I don't think that's Glover. I think that is the conductor checking off the train. I think it is too far away to be Glover." Mr. Knight was between Glover and myself. Mr. Knight was nearer to Glover than I was. He said, "I see him," and repeated the signal again. Then I repeated the signal to the engineer, and Mr. Knight cut off three of the five cars attached to the engine, and we kicked

those cars into the side-track.    Then he told me to go back
into the main line and pick up the first three cars and come
back into the central track.    We started down and I turned
the switch myself, and then I heard Glover say, "Good God,
Mr. Knight, you have killed me;" and I signaled the engineer
to stop.    I was about one car-length from Glover when I
signaled the engineer to stop.    He stopped and I ran around
the cars to where Glover was lying.    From the time that Mr.
Knight waved the engineer ahead to the time that I heard the
exclamation of Glover could not have been more than two and
a half or three minutes.    From the time he disappeared from
my sight until I heard him must undoubtedly have been four
or five minutes.    When I missed his light was the time Mr.
Knight cut off the cars.    The engineer could not see Knight
when he went in to cut the cars off.    We were about ten feet
apart.    I was the nearest to the engineer.    He cut off three
cars, and then told me to come ahead.    I think he went about
three cars and a half or four car-lengths.    From the time I
missed Glover's light until I heard him holloa it must un-
doubtedly have been eight minutes.    After I missed his light
I did not know where he was or what he was doing.    There
was nothing to injure him except the cars coming together.
From the time the cars came together until I heard him hol-
loa was about two and a half or three minutes.    When I
heard him holloa I signaled the engineer to stop, and ran
around to where he was.    When I got there I said, "Glover,
what's the matter?"    He said, "I am hurt."    I said, "Where are
you hurt?"    He said, "See my foot," and he showed me his foot
where his toes were cut, and he said, "I have a pain here"
(indicating his side or stomach).    At that time Mr. Knight
came up and said, "Have I killed that negro?"    I did not
give any answer, but Glover said, "You have not killed me yet,
but I think I will die soon."    The first thing that Glover said,
to my recollection, when I asked him how it happened, was
that he was only stooping down to pick up the pin, when the
cars came down on him.    He said that the trucks ran over him,
and then I looked at him and said, "You have got two or
three bruises on your head," and he said, "Yes, I suppose the

truck riggings did that." I was the first one to get to him. Mr. Knight was foreman there, and assisted the yardmaster in the daytime. Mr. Knight was in charge there at that time. We obeyed his orders when working there at that time. Glover obeyed his orders. The engineer was supposed to obey the signals given by the yardmaster, or the foreman or switchman. Mr. Knight was in authority over the switchman. Mr. Knight told me to stay with Glover. Glover seemed to be a sober man, and always attended to his business. He was supposed to get $54 a month. He was employed as lead switchman, and I was employed as follow switchman. His duty was to couple cars and make up trains. He got his orders from the foreman of the yard what to do. It was his duty at the time he was hurt to couple the cars together. It was necessary to couple those cars to make up the train. The nearest switch to where Glover was hurt on the western side of the track and south of him toward Gwinnett street is known as the cow-pen switch. It was about five car-lengths from there that Glover was hurt.

We went in there under Mr. Knight's orders for Glover to couple those cars to the train. We left some cars in there. The engine was about the cow-pen switch. The engine was towards Gwinnett street, and Glover was towards Liberty street. There was three or four cars beyond him, between him and Gwinnett street. Between where Glover was, where he was hurt, and where the engine was before it backed down, there was a switch or two leading off from the main line going down to the freight-house, towards East Broad street. It was dark and we were using lights. At the time of the accident I only saw one light about the train in addition to Mr. Knight's light and my light, and before that time I had only seen one light about the train besides Mr. Knight's light and my light. At the time the engineer was signaled to come down I saw one other light besides these. The conductor came up directly after the man got hurt. He was checking the train. I can't say positively, but I think I saw his light before that. The light that I thought was his was too far away to be Glover's. It was ten or more car-lengths away. When I heard Glover holloa I was on the right-hand side of the cars going towards the passenger-

shed.　The last time I saw Glover was when I missed his light. I can not say whether he had a coupling-stick at that distance. I saw him with a stick that night.　I suppose he had the stick to couple cars with.　The coupling-stick is supposed to be used to couple cars with.　When he went on duty that night he had a stick.　He passed Mr. Knight several times with the stick in his hand.　I suppose Glover was down by the cars to make a coupling.　He was supposed to make the coupling.　All this time I was alongside of the engine.　The engine was further south than Glover was.　I signaled the engineer to stop.　I took the signal from Glover and I gave it to the engineer to stop, and the engine stopped.　At that time Glover was standing outside.　When he gave the signal, in addition to my light and Mr. Knight's light I only saw one other light about the train.　It was about four or five minutes after this when Mr. Knight came and waved the engineer to come ahead.　He gave the signal through me.　At the time the engineer was waved ahead Mr. Knight was between Glover and myself.　At the time Glover got hurt, as near as I can remember, I was about seven car-lengths from him.　Mr. Knight could not have been less than six car-lengths from Glover when he was hurt.　If a man had a stick it was required that he should use it.　We picked up a stick around the yard, or wherever we could find one.　We did not have any regular rule at that time to couple cars with a stick.　Sticks were not given to the men then.　I never heard of any rule not to go between the cars to couple them until the hospital business came on.　It was not forbidden before that.　I did not know of any objection to that until here of late.　Men were only required to use them in a way. They would use a stick until it broke, and they would then use their hands.　I always found Glover a very careful man.　When Glover gave the signal to stop, the engine was on the main line, heading into the central track.　I waved the engineer ahead, after getting the signal from Mr. Knight.　We pulled straight down the main line.　I was on the main line, and Glover was between the main line and the central track.　The engine and the cars attached were between Mr. Knight and Glover.　In coupling cars sometimes the pin falls out, and you

have to stoop down to complete the coupling, pick up the pin and put it in the hole. Since the death of Glover the railroad company has furnished coupling-sticks, but not before. Glover was a very good switchman, and to my knowledge a very careful man. From the place where I last saw Glover's light to the place where I picked him up was about three or four feet. We used a coupling-stick if we had one or could get one, provided we did not have to go anywhere for it. The men did it for self-protection, because it was safer. If you did not have a stick and ran off to get one, Mr. Knight would run you off from your work. I don't know of a single case where a man was discharged for stopping to get a coupling-stick.

There was evidence that James Glover was the plaintiff's husband, that he died at the time alleged in the petition, and that his death was caused by the injuries described.

*Twiggs & Oliver*, for plaintiff.
*Erwin, duBignon, Chisholm & Clay*, for defendant.

CObb, J. Sarah Glover sued the railway company for damages alleged to have been received by reason of the homicide of her husband by the defendant. Upon the trial the court granted a nonsuit, and the case is here upon a bill of exceptions sued out by the plaintiff, complaining of the granting of the nonsuit and other alleged errors; and upon a cross-bill sued out by the defendant, assigning error upon various rulings of the court.

1. The various amendments offered by the plaintiff did not substantially change the cause of action attempted to be set forth in the original petition, and therefore were not objectionable on the ground that they set forth a new and distinct cause of action. *Ellison* v. *Georgia R. Co.*, 87 *Ga.* 691; *Central R. Co.* v. *Kitchens*, 83 *Ga.* 83; *Harris* v. *Central R. Co.*, 78 *Ga.* 525. There was enough to amend by in the original petition, and the petition as amended set forth a cause of action.

2. There was no error in refusing to dismiss the petition on the ground that it was barred by the statute of limitations. The petition alleged that the husband of petitioner was injured on April 2, 1895, and that his death resulted from these

injuries on the 16th day of November, 1895. The suit was filed October 11, 1897. No cause of action arose in favor of the widow in this case until the death of the husband. Civil Code, § 3828; *Western & Atlantic R. Co.* v. *Bass,* 104 *Ga.* 390. It is not necessary in the present case to determine when an action of this character would be barred, as in no event is there any statute that could be applicable to such a case which would raise a bar within a period of less than two years.

3. The defendant demurred to the original petition on the ground that it did not allege that the plaintiff's husband was free from fault, and the court was about to sustain the demurrer, when the plaintiff amended by adding these words: " In discharging his duties as alleged, your petitioner's husband was free from fault." Plaintiff now complains that the court erred in holding that the amendment was necessary. As the plaintiff submitted to the ruling of the court and amended her petition to conform thereto, she can not be heard now to say that the amendment was not necessary. If she had desired to except to the ruling of the court on this subject, she should have submitted to an order dismissing her case and filed her exceptions to that judgment. See *Rome R. Co.* v. *Thompson,* 101 *Ga.* 26.

4. Without expressing any opinion as to what should be the final result of this case, we think the court erred in granting a nonsuit, as the issues raised by the evidence on the questions of negligence involved were of such character that the same should have been submitted to the jury under proper instructions.

*Judgment on main bill of exceptions reversed; on cross-bill of exceptions affirmed. All the Justices concurring.*